I'm Jonathan Sternberg, and I represent the appellant, Adel Atalla. We have three issues on appeal, but I'd like to spend my limited time, most of my limited time before your honors this morning on the first issue. The court should reverse the district court's judgment against Mr. Atalla because Arkansas lacks personal jurisdiction over him. The plaintiff failed in its burden that this court has well established to show that he had sufficient contacts with Arkansas to satisfy the minimum contacts necessary for specific personal jurisdiction there. Mr. Atalla is a California resident. He's the president of Sucre Interactive LLC, who was the appellant in the argument your honors just heard, which is a California company. The Henry Law Firm, an Arkansas entity, alleged that Mr. Atalla guaranteed its contract with Sucre, the California entity, and sued him to collect on that guarantee. But besides that alleged guarantee contract, in opposition to Mr. Atalla's motion to Arkansas in his personal capacity as opposed to his corporate capacity as Sucre's president. And as this court held in the Arkansas rice growers case in 1986, which is directly on point, a nonresident corporate officer merely guaranteeing his nonresident company's contract with someone in the forum's state is insufficient to confer specific personal jurisdiction on him individually in that state. And it really is directly on point. There in Arkansas rice growers, the court reversed a judgment against California agents and shareholders of a California corporation, just as here, who personally guaranteed the corporation's debt to an Arkansas entity. The court held that this alone, including their communications with Arkansas in their corporate rather than individual capacities, their visits to Arkansas in their corporate rather than individual capacities, didn't subject them to jurisdiction in Arkansas. Well, don't we have a different situation here? We have Mr. Atalla, he signs twice as president and he signs as personally as guarantor. The defendants in rice growers were passive investors. Isn't that a distinction? The contract in Arkansas rice growers itself between the Arkansas entity and the California entity did call for a guarantee as well. And the officers, so the people in Arkansas rice growers weren't just passive, they were passive investors as to their ownership, but they were still officers of the company. It's not clear from the decision who signed the agreement itself, but the agreement did call for a guarantee. Regardless Did it call for them to, that their guarantee was personal in nature? It said that there would have to be guarantees of the investors. That's correct, Your Honor. There's a blurb at the bottom in the last portion of the Arkansas rice growers case that actually quotes the language from the contract. And the court said that's not enough. The issue is, even if that's a distinction, it's a distinction without a difference. That's still just a guarantee. It's still just the corporate officer, it's a personal contact. The guarantee in both cases is a personal contact. Regardless, Henry Law Firm was unable to point to any other personal contact besides that single guarantee. Did he ever come to Arkansas? In his corporate capacity as the president of Suker. The evidence was that he made five trips to Arkansas during the Walmart case, all in his capacity as Suker's president, and which were the only times he's ever been to Arkansas in his life. And the same thing was true in the Arkansas rice growers case. Three of the individuals there had come to Arkansas from California in connection with their duties as officers of that corporation in California, and the court held that that's not enough. You have to show that this was done in a personal capacity. Now my opponent points to three factors that the court in the Arkansas rice growers case suggested might subject a non-resident guarantor to personal jurisdiction. But they're without merit because none of them are present here. The first is a choice of law provision, or a forum selection clause in the guarantee contract. The district court here held that this contract did subject Mr. Atala to suit in Arkansas. But as my opponent concedes, there is not actually a choice of law or forum selection clause in this contract at all. As in the Arkansas rice growers case, or the Burger King case, which is the seminal case about contract jurisdiction, the bare contract without that isn't enough to show that it subjects him to suit in Arkansas. The second is the guarantor's ownership of the principle. That's the second factor the court pointed to in Arkansas rice growers that might subject personal jurisdiction. But in here, Henry Lawfirm, for the first time on appeal, tries to argue that Mr. Atala is actually an owner of Sucre Interactive LLC. That's without merit. They didn't introduce any evidence for that below. Instead, they rely on a blurb from some testimony of Aaron Sucre in the Wal-Mart case, the previous case, Your Honors, just heard, where he says, yes, Adil and I own the company. But he never actually testifies that Mr. Atala has an ownership interest. And besides, that wasn't introduced below. Mr. Atala — Can you dispute that as a fact? Yes. We absolutely dispute that. In fact, Your Honors, if you go to the corporate disclosure statement that Mr. Magnuson filed for Sucre Interactive LLC in the — in the prior case, it makes very clear, as we've always alleged below, that the only owner of Sucre Interactive LLC is another California corporation, Sucre Design Incorporated. There is no evidence of any kind before the court that Mr. Atala is an owner of Sucre Interactive. And the few cases there are about ownership mean an actual ownership, meaning I own the shares. The guarantors are sued collectively if they're the 100 percent owners or the majority owners, or it's some sort of sole owner. But here, there's no evidence of that at all. And the third element that the Court pointed to in that case is that the contract wouldn't have been entered into without the guarantee. Henry Laughram tries to argue this, but there's no correspondence in the record at all between it and Mr. Atala that even mentions a guarantee. Not once in any of their correspondence is the word guarantee mentioned. And in fact, in his affidavit that he filed in response to Mr. Atala's motion to dismiss, Mr. Henry doesn't mention the guarantee either. He never once comes out and says, well, I wouldn't have entered into this without this guarantee. Well, wasn't it kind of an unusual fee arrangement to have this special fund set up from which the law firm would draw because of their sense of insecurity about whether Atala would pay? Well, it's not whether Atala would pay. It's whether Sucre would pay. Exactly. Isn't that the whole point, though? The whole point of this personal guarantee is Sucre has not been paying the fees as they've become due. Attorneys have quit. This is what the third group of lawyers that have danced into this dance. Henry Laughram says, hey, we want to get paid, and we're not doing this in the absence of your personal guarantee. That's never once communicated anywhere in the record to my client. In fact, on page 239 of our appendix, which is one of the e-mails where he presents this contract, he calls this, quote, a standard engagement letter. There is actually – sorry, Your Honor. Atala calls this a standard engagement letter? No, no, no. Mr. Henry calls this a standard engagement letter. Okay. It seems not to be very standard in my practice as a lawyer. I agree. Your Honor, I think exactly the same thing. I agree. I've never seen something like this in my career either. I mean, because of the way it's structured, it's apparent. You look at it, you'd say, well, there's a problem with somebody getting paid, or we wouldn't be having this particular dance, you know. I agree. Establish this fund that I can draw against. If it gets below a certain number, I think I remember it was at – $25,000. $25,000. I could quit, you know. I mean, it seems like we're worried about our ability to get paid. And I appreciate that. And then the question we've got is that there's these 769 e-mails, some of which do in fact deal with, you know, are you paying the bill or not paying the bill. And are we responsibilities because at no point is there any mention of the word guarantee, that in the absence of the word guarantee, it's always just Sucre we're looking for to payment on this. All of the e-mails are directed towards Sucre and Sucre's corporate counsel, and both Aaron Sucre and Adel Atala. They aren't about collecting on the guarantee. And if you're going to interpret the contract as applying to both Mr. Atala and Sucre, then all of those collections things Your Honor just mentioned would also apply to Mr. Atala. But they never once sought to collect money personally from Mr. Atala. Okay. Seeing I only have a minute left for rebuttal, I'll leave it there for right now. Thank you, Your Honors. Thank you, Mr. Sternberg. Mr. Carlin? Good morning, Your Honors. May it please the Court. I'm Tim Carlin. I represent Henry Law Firm in this matter. I'd urge the Court to look at the memorandum of opinions from the district court. I suspect that's where you usually start in these things, but the district court summed this up better than I can. He nailed it. He said, what should have been a simple collection case ended up becoming a dragged out, painful slog to the case's inevitable conclusion. Ultimately, the court found on summary judgment that the guarantee agreement that Atala signed was unambiguous and valid, and in light of the fact that Sucre refused to pay the bill it owed to HLF, there was no genuine dispute that Atala was collaterally liable to HLF for Sucre's legal debts. The contract, as I recall, was about a page long. It said Sucre Interactive and Adel Atala were parties, and it defined them together as the client. At the conclusion, again, it made it clear that there were two parties here, and Mr. Atala signed on behalf of Sucre Interactive as its president, and then he also signed on his own behalf as personal guarantor. Now I don't think I can travel to Minnesota in my professional capacity and claim that I haven't traveled to Minnesota in my personal capacity. That seems kind of silly to me, but if you consider all of the facts that were before the court that support personal jurisdiction, it's clear. It's clear that Mr. Atala is sophisticated about hiring attorneys from other states, that Mr. Atala reached into Arkansas to contact Mr. Henry to represent him and his company in Arkansas litigation. For Mr. Atala to say that the district court in Fayetteville didn't have jurisdiction is particularly outlandish, considering that this case was originally filed in state court, and Sucre removed the case to the district court in Fayetteville. Sucre never made any effort to say this should be in California or anywhere else. Sucre clearly submitted to the jurisdiction of the district court. To the extent that you want to try to split out the difference between Atala and Sucre, the facts don't warrant that. They have the same substantive identity. They are one and the same. Atala was a manager. He was an owner. The testimony could not be more clear than what we quoted to you. Mr. Atala was involved in every stage of this. Your opponent disputes that Sucre could be mistaken or wrong when he says that Atala is his partner or co-owner in the company. Is there something besides Sucre's statement in the record to verify that Atala is an owner? Well, Mr. Atala clearly had the power to contract on behalf of the company. There's no dispute that he was the president of the company. I think what Sucre is saying is there's some intermediate corporation between the actual human owners and Sucre Interactive. Mr. Atala was part of 3,000 emails about this case. Mr. Atala, specifically, there were about 700 emails to or from him. He was clearly a decision maker throughout this. He was involved in every step of the way. Additionally, he testified that he couldn't come to trial because somebody needed to stay in California and run the company while this trial was going on. Is there some authority on the significance of large numbers of digital communications with respect to jurisdiction? It just goes into the mix, Your Honor. Aren't there, in fact, specific jurisdiction cases in our court, in the U.S. Supreme Court, that say mere electronic communications standing alone are insufficient as a matter of law to establish specific jurisdiction, right? So we've got that and we've got personal presence here. The question is, did he show up here with his personal presence in a corporate or representative capacity or in both, his personal capacity and as a corporate representative? Sucre says no, you say yes, and so that's the question we've got to decide there. Then the other issue is that if the contractual agreement sets forth with sufficient clarity that Atal is a party to the contract, then you've got this whole different question is that if you enter into a contract to retain the services of a lawyer to appear in an Arkansas court or a federal district court sitting in Arkansas by a diversity jurisdiction and for no other reason at all, so it's really Arkansas law and an Arkansas matter that ordinarily would have been in Arkansas court, is the entry of that contract as a guarantor, a sufficient presence to put them on notice under the Constitution and the International Shoe Standard that they could be hailed into a court to answer on the fees, right? That's the whole thing in a nutshell, right? Yes, Your Honor. That's a good summary. My first two questions would be sort of, my first question would be, well, what about this personal and corporate capacity thing? You seem to poo-poo it and say it's a red herring, but I'm saying, well, why so? I mean, don't people appear all the time in their professional capacity or their corporate capacity and not personally? But here, the substantive identity of the only reason that Mr. Atala reached into Arkansas to hire a lawyer was to represent his company in Arkansas litigation. It's not like rice growers where you had minority shareholders who were not active in the day-to-day management of the company. It's very different than that. The record is abundantly clear that Mr. Atala is the president. That's not in dispute. He's a decision-maker. Is he essentially Sucre? Is that what the argument really is? He and Aaron Sucre are partners, yes. Yes, they're partners in how they run the business, and he was a decision-maker throughout the course of this. He hired and fired many attorneys. Mr. Atala did personally. Mr. Atala was involved in negotiating the contract with Walmart. The underlying contract. And all of that was before Judge Brooks. Judge Brooks had a particularly unique situation here because he had lived with the Walmart case for two years. He knew a lot about what was going on here. And it's not any one of those single factors, Judge Erickson, that determines personal jurisdiction. There's a case, KV Pharmaceuticals. It's not some conceptual test. It's all of those things taken together. I got that, but what I'm just saying is that ordinarily we say electronic communication is not enough because we say... That's not all. That's just not. And so we're now saying, okay, what's the plus? And the plus in this case is he was personally present, physically present, don't want to use personal because that gets us into that quagmire again, and that he entered into this knowing that the litigation was going to take place in Arkansas, that the legal fees would be incurred in Arkansas, and therefore it is predictable that you could be hailed into an Arkansas court on the question of fees. Absolutely, Your Honor. The case was already in Arkansas. Recall Mr. Henry came late to the game, and the case had been going in the United States District Court in Arkansas for many months. He knew exactly where the litigation was. And, you know, the flip side of this is it would create this artifice where a corporate officer could say, yeah, sure, I'll promise to guarantee this in some other state, and then just ignore that. Well, you wouldn't really ignore it. You just got to go out and sue him in California where he lives, right? Right. Sure. That's true. But the record is replete with evidence of Mr. Atala's substantive identity with Suker, and that's those three things that Mr. Sternberg talked about briefly. And yes, I'll grant you there is not a choice of law provision in the contract. That's one of the three things that's missing. But the three are not and, they are or. The factors that are present are the substantive identity between Suker Interactive and Atala Atala. Clearly, he was acting on behalf of the company and was empowered to do that and was the president of the company, and we believe the facts are clear that he's an owner, at least a beneficial owner. He's not a passive investor who was not involved and suddenly gets dragged into Arkansas to be sued. He was involved every step of the way. The other, the second of the three factors also applies, and that's that Mr. Henry would never have entered this agreement but for his personal guarantee. And that's apparent in that email exchange. And you know, the contract speaks for itself. It says Atala Atala and Suker, and it says he's a personal guarantor, and then he signs twice. Well, certainly, wouldn't it, it would have been better if, if guarantor and the contract would have been explained or at least signed? I don't, I don't think that's necessary, Your Honor, because that's, that's, there was sort of an argument that, well, what is he guaranteeing? Well, he's guaranteeing the contract that Suker signed. I mean, those are the exact same terms that is the contract between Suker that is what the guarantee agreement is for. This is probably a complete irrelevancy, but I just have to ask this question. How is it that your client perceived this particular contract as a standard employment contract for an attorney or a standard retainer agreement? I don't know the answer to that, Your Honor. I mean, that's beyond the record. That might have been a careless way to word it. I don't know. Yeah, I was just kind of, I mean, but I'm sure. There's nothing standard about this case, Your Honor. Yeah. Yes. All right. But, you know, in closing, we think it's a simple matter of failing to meet proof with proof. There were no genuine issues of fact. The contract is unambiguous on its face, and it should be affirmed. Thank you, Your Honors. Thank you, Mr. Cullin. Mr. Sternberg, your rebuttal. Yes, Your Honors, in the minute I have left, let me address a couple of those ideas. Opposing counsel started out by saying that there was personal jurisdiction over Suker because it had brought a claim and had removed the case to federal court in Arkansas. And in Calder v. Jones, the U.S. Supreme Court held specifically that where you have two different parties, they have to be, personal jurisdiction over them has to be analyzed and addressed separately. So the fact that there's personal jurisdiction over Suker doesn't matter. Substantive identity doesn't mean being the CEO of the company and being able to make decisions on its behalf. There's the C&C case that we cite from the Western District of Arkansas in 2015, which does a really good nationwide analysis of that, where that was a CEO who had actually personally funded the contract that they were guaranteeing. And the court still held that there wasn't jurisdiction over them in Arkansas. It was also signed at the same time. And as far as wouldn't have agreed, that was never said once, not in any communications between Mr. Henry and Mr. Ritalo. There's my minute, your honors. We'd ask the court to reverse and thank you for your time. Thank you, Mr. Sternberg. The court thanks both counsel for the argument you provided to the court today and the briefing that's been submitted. We will take the case under advisement.